**FLAMEOUT DESIGN
& FABRICATION,
INC., Appellant,**

v.

**PENNZOIL CASPIAN CORPORATION,
Pennzoil Company, and Pennzoil Exploration and Production Company,
Appellees.**

No. 01–98–00543–CV.

Court of Appeals of Texas,
Houston (1st Dist.).

May 27, 1999.

Marti L. Batson, Lloyd R. Cunningham, Houston, for Appellant.

Paul L. Mitchell, Claudia Frost, Jacalyn Ann Hollabaugh, Brent Clark Perry, Houston, for Appellee.

Panel consists of Justices COHEN, HEDGES, and NUCHIA.

## OPINION

SAM NUCHIA, Justice.

This is an appeal of a summary judgment in favor of defendants in a lawsuit alleging breach of contract, anticipatory repudiation, economic duress/business coercion, fraud, negligent misrepresentation, and violation of the Texas Deceptive Trade Practices Act. We affirm.

## BACKGROUND

In 1992, Pennzoil Caspian Corporation ("PCC") became involved with the State Oil Company of the Azerbaijan Republic ("SOCAR") in a major Gas Utilization Project in the Caspian Sea. PCC was to provide and install turbine-driven compressors and related process equipment and pipeline for the project and was to operate and maintain the compressors and related equipment for a period of time after installation.

PCC contracted with VECO Corporation to construct the compressor station and to provide engineering and procurement logistics for the project. VECO searched for a parts supplier and, after discussions with several potential suppliers, recommended to PCC that plaintiff, Flameout Design & Fabrication, Inc. ("Flameout"), become the parts supplier. VECO represented to PCC that Flameout was offering to supply original equipment manufacturer ("OEM") parts for the commissioned start up and for replacement parts.

An internal memo on PCC letterhead dated August 18, 1993 briefly summarized proposals by different equipment suppliers. This memo stated:

Flameout has presented a quotation of $937,832.24 and has promised delivery of commissioning items within 4 weeks with tools and balance of items 3 months except the spare impellars at 4 months. Flameout is offering original manufacturer parts. . . .

Our recommendation is to proceed with Flameout.

On September 10, 1993, Allan Hardison, VECO employee and Procurement and Logistics Manager for the project, issued a letter of intent to Flameout on PCC letterhead. This letter confirmed PCC's intention:

to purchase from your company turbine commissioning spare parts per the lists which are being developed by Mr. John Blackwelder and which have been reviewed by you. Acquisition of these parts is predicated upon finalizing these lists and appropriate unit prices for items presented to your company, and in accordance with the agreements reached at the meeting held in our offices on September 7, 1993. Payment terms for these parts must also be mutually agreed.

A document entitled "Parts Listing," dated January 20, 1994, contains lists of parts, quantities, and prices. The quantities are in columns headed "Comm." and "3 Year." This list, which the parties call the Baku list, is not signed, and there is no indication on the document to show who created it.

On February 22, 1994, in a letter to Paula Jacobs of PCC, Michael Moore, President and CEO of Flameout, wrote, "Flameout certifies that all the material supplies (sic) is NEW OEM equipment. No surplus, refurbished or auctioned materials will be supplied."

On April 28, 1994, PCC employee K.B. Whitley wrote Flameout and Transoceanic Shipping Company, "Gentlemen: Attached is the procedure for receiving spare parts at Transoceanic. This procedure should be implemented immediately." Attached

to the letter is a two-page document entitled "Receiving Procedure." It begins, "For purchase orders 010763 02, 010768 01, and future purchase orders for the three year commissioning parts, as per list compiled by Flameout Design and Fabrication, and Pennzoil Caspian Corporation and Letter of Intent dated September 11(sic), 1993, (see attached). After consultation with Transoceanic, the following basic receiving procedure will be followed." Procedures for shipping and receiving and some special procedures for certain equipment are then stated in the document.

During the time Flameout was involved in this project, PCC issued between 1.1 and 1.6 million dollars in written, signed purchase orders to Flameout, according to Moore's estimate. In addition, PCC gave some verbal purchase orders between midsummer and December 1993. These verbal orders were filled by Flameout, and PCC paid for the equipment ordered.

On July 29, 1994, PCC wrote a letter to Flameout confirming that PCC wished Flameout to continue to expedite the delivery of the remaining items on purchase orders 010763 and 010768.

On October 25, 1994, Flameout wrote PCC informing it that Flameout would not quote or take any new orders from Pennzoil. On October 28, 1994, Flameout wrote PCC, stating in some detail its reasons for refusing to accept new orders from PCC. Flameout complained of PCC's unwillingness to abide by "the Agreement" between Flameout and PCC, Flameout's "unworkable" attempts to accommodate PCC's "changed positions," and PCC's purchase of certain parts from suppliers other than Flameout.

In January 1995, Flameout sued PCC alleging causes of action for breach of contract, anticipatory repudiation, violation of the Texas Deceptive Trade Practices Act, fraud, negligent misrepresentation, and the defense of estoppel to deny the enforceability of the agreement. Flameout later amended its petition to add Pennzoil Company and Pennzoil Exploration and Production Company as defendants (collectively referred to herein as "PCC"). It also added a cause of action for "economic duress/business coercion."

PCC filed a motion for summary judgment under rule 166a(i) of the Texas Rules of Civil Procedure, asserting that there was no evidence to support at least one element of each of Flameout's causes of action. PCC's motion was granted by the trial court.

## STANDARD OF REVIEW

■ Under rule 166a(i), a party may move for summary judgment if there is no evidence of one or more essential elements of a claim or defense on which an adverse party would have the burden of proof at trial. Tex.R. Civ. P. 166a(i). Thus, a no-evidence summary judgment is similar to a directed verdict. *Jackson v. Fiesta Mart, Inc.,* 979 S.W.2d 68, 70 (Tex.App.—Austin 1998, no pet.); *see also* Hittner & Liberato, *Summary Judgments in Texas,* 34 Hous. L.Rev. 1303, 1356 (1998). A party may move for a no-evidence summary judgment after there has been adequate time for discovery. Tex.R. Civ. P. 166a(i). The motion may not be general, but must state the elements on which there is no evidence. *Id.* The trial court must grant the motion unless the nonmovant produces more than a scintilla of evidence raising a genuine issue of material fact on the challenged elements. *See* Tex.R. Civ. P. 166a(i) and cmt. to 1997 change. Thus, the party with the burden of proof at trial has the burden of proof in the summary judgment proceeding.

The general requirements of summary judgment practice continue to be governed by the existing rules. *Id.* Therefore, in reviewing a summary judgment, we must indulge every reasonable inference in favor of the nonmovant and resolve any doubts in its favor. *Randall's Food Mkts., Inc. v. Johnson,* 891 S.W.2d 640, 644 (Tex.1995).

## DISCUSSION

### The Statute of Frauds

In its first issue presented, Flameout contends the trial court erred in granting the summary judgment on its breach of contract claims because Flameout presented written documents that satisfy the statute of frauds. Flameout argues that it had a three-year agreement with PCC to supply the parts on the Baku list.

The UCC Statute of Frauds provides:

Except as otherwise provided in this section a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker.

TEX. BUS. & COM.CODE ANN. § 2.201(a) (Vernon 1994).

The general statute of frauds provides that an agreement that is not to be performed within one year is not enforceable unless the agreement is in writing and signed by the person to be charged with the agreement. TEX. BUS. & COM.CODE ANN. § 26.01 (Vernon 1987).

■ It is uncontested that the alleged agreement in this case is for the sale of goods for a price of more than $500 and is not to be performed within one year. Therefore, both the UCC and general statute of frauds apply.

■ Flameout asserts that the essential elements of its three-year agreement with PCC are contained in three written docu-

ments: (1) the September 10, 1993 letter of intent; (2) the January 20, 1994 Baku list; and (3) the April 28, 1994 letter from PCC attaching new shipping and receiving procedures.[1] Flameout argues that these three documents, when read together, are sufficient because they identify the parties to the agreement, the subject matter of the agreement, quantity and price of the goods, and they specify a duration.[2] Flameout also argues that these documents satisfy the signature requirement under the UCC.

A plain reading of these three documents shows they do not constitute a contract for the sale of goods. The letter of intent is nothing more than an expression by PCC of its intention to do business with Flameout under agreements that were reached at an earlier meeting. This letter is not any evidence of an enforceable agreement between Flameout and PCC.

■ The Baku list is an extensive list of parts and equipment required for the project.[3] There is nothing on the list to indicate that it is a purchase order, nor is there anything on the list to indicate that the items listed are to be ordered from Flameout, if at all. In addition, the list is not signed. Flameout's contention that a typed reference, in Russian, to Pennzoil Caspian Corporation on each page constitutes a signing is completely without merit. Assuming that Flameout has correctly identified the typed reference to PCC, we see nothing in the document to indicate that PCC has signed or authenticated the document, as required by the UCC, as a purchase order or a contract to purchase the listed parts from Flameout.

---

1. Flameout contends the April 28, 1994 letter, which is simply a cover or transmittal letter, incorporates the shipping procedures so that the procedures become a "signed" document. The letter does not contain language of incorporation.

2. Flameout also generally asserts that "numerous" other documents are evidence of the agreement. We have reviewed the eight documents specifically listed by Flameout and

have determined that they do not support Flameout's contention.

3. PCC evidently interpreted certain allegations by Flameout to be a claim that Flameout was to be the exclusive supplier of all PCC's spare parts requirements. In its reply brief, Flameout denies such an intent. Flameout asserts that its claim is that it had an agreement to supply the parts listed on the Baku list.

The April 28, 1994 cover letter from PCC and its attached receiving procedures do not, on their face, indicate that a contract for sale has been made between PCC and Flameout. The attachment sets forth receiving procedures for the three-year commissioning parts,[4] and the cover letter requests immediate implementation of the procedures.

Flameout has produced no evidence of a writing sufficient to indicate a three-year contract for the sale of goods by Flameout to PCC. We overrule Flameout's first issue.

**Defenses to the Statute of Frauds**

■ In its second issue presented, Flameout argues that two defenses to the statute of frauds, part performance and estoppel, apply to this case. Flameout did not assert the defense of part performance to the trial court and has, therefore, waived this defense.

■ To establish an equitable estoppel defense, Flameout must prove (1) a false representation or concealment of material facts, (2) made with knowledge, actual or constructive, of those facts, (3) with the intention that it should be acted on, (4) to a party without knowledge, or the means of knowledge of those facts, (5) who detrimentally relied on the misrepresentations. *Schroeder v. Texas Iron Works, Inc.*, 813 S.W.2d 483, 489 (Tex.1991).

■ Although Flameout argues that "Pennzoil clearly made false representations of material fact," it does not state what those false representations were and does not refer us to any summary judgment proof except for a general reference to its president's 13-page affidavit.[5] Flameout has produced no evidence of any false representation of material fact by PCC.

We overrule Flameout's second issue.

**Burden of Proof**

■ In its third issue presented, Flameout contends the trial court erred in improperly shifting the burden of proof to Flameout to disprove PCC's affirmative defense of the statute of frauds. Flameout did not object in the trial court that the burden of proof was improperly shifted and has, therefore, waived this issue.[6]

We overrule Flameout's third issue.

**Anticipatory Repudiation**

In its fourth issue presented, Flameout contends that PCC anticipatorily repudiated the agreement.

■ Before there can be an anticipatory repudiation of a contract, there must first be an enforceable contract. In our ruling on Flameout's first issue, we held that there was no enforceable contract between Flameout and PCC.

Accordingly, we overrule Flameout's fourth issue.

**Economic Duress/Business Coercion**

■ In its fifth issue presented, Flameout contends that it produced sufficient evidence to create a fact issue re-

4. Commissioning parts, referenced in the Baku list and the receiving procedures, refers to those parts needed for the start-up of the project. Spares, referenced in the Baku list, refers to parts needed for replacement and maintenance after the project is in operation.

5. The affidavit of Michael Moore, Flameout's president, is essentially a narrative recitation of the facts contained in Flameout's petition. It does not purport to be facts of which Moore has personal knowledge. Rather, it states, "During Flameout's involvement in the project, I was advised of the following facts."

6. Even if Flameout had made its objection to the trial court, this issue is without merit. The applicability of the statute of frauds to Flameout's breach of contract action was established by Flameout's petition, which showed on its face that the complaint involved a contract that could not be performed within one year and was for the sale of goods for more than $500. *See Manahan v. Meyer*, 862 S.W.2d 130, 133 (Tex.App.—Houston [1st Dist.] 1993, writ denied). Therefore, it was Flameout's burden to produce evidence that the statute of frauds was satisfied or that Flameout was subject to some exception or defense to the statute of frauds.

garding the existence of economic duress/business coercion.

In February 1994, PCC issued a purchase order for approximately $770,000 in parts and issued a check for an agreed 20 percent pre-payment of the purchase order. PCC did not deliver the check to Flameout, but informed Flameout that it could no longer use CSE, a vendor from whom Flameout had been purchasing parts, because CSE dealt primarily with surplus parts rather than new, OEM parts.

Flameout asserts that PCC insisted that Flameout execute a change order "which added new, onerous requirements" to their agreement without any consideration. Flameout never specifies the nature of these "onerous requirements" other than requiring the use of a vendor who could supply new, OEM parts. Flameout does not direct us to, and we have been unable to find, the change order in the record.

■ To recover for economic duress or business coercion, Flameout would have to prove that (1) PCC threatened to do some act that it had no legal right to do; (2) the threat was of such a character as to destroy Flameout's free agency; (3) the threat overcame Flameout's free will and caused it to do that which it would not otherwise have done and that it was not legally bound to do; (4) the restraint was imminent; and (5) Flameout had no present means of protection. *See Creative Mfg., Inc. v. Unik, Inc.*, 726 S.W.2d 207, 211 (Tex.App.—Fort Worth 1987, writ ref'd n.r.e.).

Flameout has produced no evidence that PCC threatened to do some act that it had no legal right to do. Flameout informed PCC in the February 22, 1994 letter from Moore to Jacobs that CSE would provide new, OEM parts. In fact, CSE provided salvaged or surplus parts, according to the testimony of its president, John Chapman. PCC had a right to order new, OEM parts and to insist that Flameout use vendors who could supply those parts.

We overrule Flameout's fifth issue.

**Fraud and Negligent Misrepresentation**

■ In its sixth issue presented, Flameout contends it produced sufficient evidence to create a fact issue regarding its fraud and negligent misrepresentation claims. In its brief, Flameout does not clearly distinguish these two causes of action and applies its argument to both.

■ A plaintiff may not circumvent the statute of frauds by asserting a claim for fraud. *Leach v. Conoco, Inc.*, 892 S.W.2d 954, 960 (Tex.App.—Houston [1st Dist.] 1995, writ dism'd w.o.j.). A fraud cause of action is barred by the statute of frauds when the plaintiff seeks to gain the benefit of the bargain he would have obtained had the contract been performed. *Id.* To avoid this rule, Flameout contends in its brief that it is seeking damages resulting from its reliance on the alleged misrepresentations. However, in its response and supplemental response to PCC's motion for summary judgment, Flameout did not attach any summary judgment proof to support its separate claim for fraud, which, under rule 166a(i), it was required to do. The gist of Flameout's cause of action for fraud is clearly PCC's alleged breach of the agreement, and this cause of action is barred by the statute of frauds.

■ To establish a cause of action for negligent misrepresentation, the plaintiff must prove (1) the representation was made by a defendant in the course of his business or in a transaction in which he has a pecuniary interest; (2) the defendant supplied false information regarding an existing fact for the guidance of others in their business; (3) the defendant did not exercise reasonable care or competence in obtaining or communicating the information; and (4) the plaintiff suffered pecuniary loss by justifiably relying on the representation. *Federal Land Bank Ass'n of Tyler v. Sloane*, 825 S.W.2d 439, 442 (Tex. 1991).

Flameout does not direct us to any summary judgment evidence to support its allegations of misrepresentations by PCC, but refers only to the allegations in its petition. Pleadings are not competent summary judgment evidence. *Laidlaw Waste Systems, Inc. v. City of Wilmer*, 904 S.W.2d 656, 660 (Tex.1995).

Flameout argues that its contention that PCC (1) entered into a three-year agreement with Flameout, (2) denied making the agreement, and (3) failed to perform the agreement is evidence from which we may infer that PCC promised to take future action with the intent not to perform. Such an inference on our part would nullify the statute of frauds and turn mere allegations into presumed evidence. This we will not do.

Flameout has produced no evidence to support its contention that PCC entered into a three-year contract with Flameout. In addition, Flameout has produced no evidence to support its allegations of fraudulent or negligent misrepresentations. All Flameout's complaints are tied to its allegations of the existence and breach of a three-year contract. If PCC's conduct would give rise to liability only because it breached the agreement, Flameout's claim sounds only in contract. *See Southwestern Bell Tel. Co. v. DeLanney*, 809 S.W.2d 493, 494 (Tex.1991).

Flameout's reliance on *Formosa Plastics Corporation USA v. Presidio Engineers and Contractors, Inc.*, 960 S.W.2d 41 (Tex.1997), is misplaced. In *Formosa Plastics*, there was evidence to support Presidio's complaint that Formosa Plastics intentionally perpetrated a fraud on Presidio. We have no such evidence in the present case.

We overrule Flameout's sixth issue.

**DTPA**

In its seventh issue presented, Flameout contends that it is a consumer under the Texas Deceptive Trade Practices Act and has a claim under the DTPA separate and apart from its breach of contract claim.

Under the DTPA, a consumer is one who seeks or acquires, by purchase or lease, any goods or services. TEX. BUS. & COMM.CODE ANN. § 17.45(4) (Vernon 1987). The goods or services sought or acquired must form the basis of the complaint. *Cameron v. Terrell & Garrett, Inc.*, 618 S.W.2d 535, 539 (Tex.1981).

In this case, Flameout is undoubtedly a consumer as to *someone*. However, Flameout is not a consumer as to PCC. Under the alleged agreement, PCC was to consume goods supplied by Flameout. Furthermore, the goods purchased are not the basis of Flameout's complaint. Flameout's complaint is that PCC did not perform according to an alleged agreement. Allegations of a breach of contract will not support a cause of action under the DTPA. *See Crawford v. Ace Sign, Inc.*, 917 S.W.2d 12, 14 (Tex.1996).

We overrule Flameout's seventh issue.

**PCC's Cross–Points**

Flameout objects that PCC did not file a notice of appeal and contends these cross-points should not be considered. Because PCC does not ask for greater relief than that granted by the trial court, it was not required to file a notice of appeal as a prerequisite to presenting these points. *See* TEX.R.APP. P. 25.1(c).

PCC raises two cross-points. In the first, PCC contends the trial court should have sustained its objections to Flameout's summary judgment evidence. That evidence consisted primarily of a 13–page affidavit by Michael Moore, Flameout's president, some documentary evidence, and deposition excerpts.

In light of our ruling on Flameout's issues, we need not reach PCC's first cross-point.

PCC also asserts that this Court does not have jurisdiction because Flame-

out lost its corporate charter due to administrative forfeiture on February 29, 1998, for failure to pay its corporate franchise tax, citing section 171.309 of the Texas Tax Code.

Section 171.309 governs forfeiture of a corporate charter by the secretary of state. There is no evidence that the secretary of state has instituted forfeiture proceedings against Flameout.

Section 171.251 provides that, if a corporation does not pay its corporate franchise tax, its corporate privileges are forfeited. Under section 171.252, if a corporation's corporate privileges are forfeited, the corporation is denied the right to sue or defend in a court of this state. These sections would apply to Flameout.

 However, section 171.251 is not jurisdictional. *See Hardwick v. Austin Gallery of Oriental Rugs, Inc.,* 779 S.W.2d 438, 441 (Tex.App.—Austin 1989, writ denied). The purpose of the statute is to enforce collection of state franchise taxes, not to prohibit a corporate cause of action. *Bluebonnet Farms, Inc. v. Gibraltar Sav. Ass'n,* 618 S.W.2d 81, 85 (Tex.Civ.App.—Houston [1st Dist.] 1980, writ ref'd n.r.e.). Once the corporation pays the delinquent taxes and is reinstated, the payment relates back and revives the corporate rights that were forfeited. *Id.*

Flameout has now paid its corporate franchise tax, and the issue is moot. Accordingly, we overrule PCC's second crosspoint.

Having overruled all of Flameout's issues on appeal, we affirm the judgment of the trial court.